FILED ✓    ___ RECEIVED
___ ENTERED    ___ SERVED ON
COUNSEL/PARTIES OF RECORD

JAN 2 1 2014

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

P. Jeffrey Black
7582 Las Vegas Blvd S #450
Las Vegas, NV 89123-1009
(800) 980-2185

*Plaintiff Pro Se*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

|  |  |
|---|---|
| P. JEFFREY BLACK, | * |
| Plaintiff, | *   Case No. 2:10-CV-02040-JCM-VCF |
| v. | * **PLAINTIFF'S MOTION FOR** |
| UNITED STATES DEPARTMENT | * **SUMMARY JUDGMENT AND** |
| OF HOMELAND SECURITY, | * **MEMORANDUM OF POINTS AND** |
| Defendant. | * **AUTHORITIES IN SUPPORT OF** |
|  | * **MOTION FOR SUMMARY JUDGMENT** |

COMES NOW the Plaintiff P. Jeffrey Black, appearing *pro se*, respectfully moves this Court for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56-1. During the pendency of this FOIA litigation, the government Defendant has produced a trickle of redacted documents, and has improperly withheld the majority of relevant documents in full. Therefore, the government Defendant's action are contrary to the strong guidelines of the FOIA — that the public is entitled to know what its government is doing.

Dated: January 20, 2014

Respectfully Submitted,

_____
P. Jeffrey Black
*Plaintiff Pro Se*

1

P. Jeffrey Black
7582 Las Vegas Blvd S #450
Las Vegas, NV 89123-1009
(800) 980-2185

*Plaintiff Pro Se*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

|  |  |
|---|---|
| P. JEFFREY BLACK, | * |
| Plaintiff, | * Case No. 2:10-CV-02040-JCM-VCF |
| v. | * |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | * **MEMORANDUM OF POINTS AND AUTHORITES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| Defendant. | * |

## INTRODUCTION

On January 21, 2009, President Obama issued a Presidential Memorandum noting the importance of openness and transparency in our government. "A democracy requires accountability, and accountability requires transparency. As Justice Louis Brandeis wrote, 'sunlight is said to be the best of disinfectants.'" Presidential Documents, *Memorandum for the Heads of Executive Departments and Agencies on Transparency and Open Government* (January 21, 2009) (74 Fed. Reg. 4685, January 26, 2009). This Presidential Memorandum states that FOIA "should be administered with a clear presumption; in the face of doubt, openness prevails." [EXHIBIT 12].

The President further stated in his Memorandum, that information should not be kept confidential "merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears." Further, "all agencies should adopt a presumption in favor of disclosure, in order to renew their commitment

to the principles embodied in FOIA, and to usher in a new era of open Government. The

presumption of disclosure should be applied to all decisions involving FOIA."

On March 19, 2009, the Attorney General, reiterated these principles of openness and

transparency when he issued new FOIA guidelines for all executive agencies. *See* Attorney

General, Eric Holder, *Memorandum for Heads of Executive Departments and Agencies* (March

19, 2009) [EXHIBIT 13]. The Attorney General's Memorandum provides that "an agency

should not withhold information simply because it may do so legally," "[a]n agency should not

withhold records merely because it can demonstrate, as a technical matter, that the records fall

within the scope of a FOIA exemption," and "encourage[s] agencies to make discretionary

disclosures of information." Moreover, the Memorandum reiterates both FOIA and DHS

regulations regarding FOIA requests, and instructs agencies to "consider whether it can make

partial disclosure" and "even if some parts of a record must be withheld, other parts either may

not be covered by a statutory exemption, or may be covered only in a technical sense, unrelated

to the actual impact of disclosure." See also 5 U.S.C. § 552(B) and 6 C.F.R. § 5.6(c)(3). The

D.C. Circuit also recently reaffirmed FOIA's commitment to transparency and openness by

stating:

> "Finally, the documents at issue here lie at the core of what FOIA seeks to
>
> expose to public scrutiny. They explain how a powerful agency performing
>
> a central role in the  functioning of the federal government carries out its
>
> responsibilities and interacts with  other government agencies. As we have
>
> explained, 'the strong policy of the FOIA [is] that the public is entitled to
>
> know what its government is doing and why."

*Public Citizen v. OMB*, 598 F.3d 865 (D.C. Cir. 2010) (citing *Coastal States Gas Corp. v.*

*Department of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980)).

Unfortunately, under a DHS policy in effect since 2006, political appointees have

received detailed information about the identity of FOIA requesters and the topics of their

requests in weekly reports, before FOIA career staff could complete the processing of the

requests.  See *FOIA Section of the DHS Cabinet Report to the White House Submission*

1    *Guidelines Updated August 4, 2006*, and *Guidelines for Reporting Significant FOIA Activity for*

2    *Inclusion in the Cabinet Report to the White House July 7, 2009*.  The policy requires DHS

3    career staff to provide Secretary Napolitano's political staff with information, including where a

4    requester lives and the requester's affiliation or employer. Despite DHS protestations that the

5    policy has been retracted, there has been no publication whatsoever about a new policy, or the

6    end of the old policy practices. This exposed policy is contrary to federal law and Supreme

7    Court holdings, as the FOIA does not permit agencies to select FOIA requests for political

8    scrutiny of either the request or the requester. The Supreme Court has clearly stated that

9    disclosure of documents under FOIA will not depend on either the identity of the requester, nor

10   the reasons for the request. See *National Archives & Records Administration v. Favish*, 541

11   U.S. 157, 170, 172 (2004); See also *United States Department of Justice v. Reporters*

12   *Committee For Freedom of the Press*, 89 U.S. 749, 771 (1989) (stating that the requester's

13   identity has "no bearing on the merits of his ... FOIA request").

14       The DHS policy of requiring political review came to light after the Associated Press

15   ("AP") submitted a FOIA request in January 2010 to DHS, seeking agency documents from

16   2009, directing FOIA staff to submit FOIA requests to political appointees prior to processing

17   the requests, as reported by Ted Bridis, *AP Impact: A political filter for info requests*

18   (Associated Press, July 21, 2010) [EXHIBIT 14], and also reported by Kim Zetter, *Political*

19   *Appointees Vetted DHS Public Records Request* (Wired.com, July 22, 2010) [EXHIBIT 15].

20       The Office of Government Information Services ("OGIS") mediated disputes between

21   the Associated Press and the agency concerning the AP's FOIA request, securing the disclosure

22   of more than 1,000 pages of agency records. The over 1,000 agency documents released reveals

23   a persistent agency practice of flagging FOIA requests from watchdog organizations for referral

24   to political appointees. A thorough review of the released documents demonstrates that DHS

25   required political appointees to review the determinations of FOIA career staff assessments to

26   certain requests, before documents were disclosed by the agency. The released documents

27   indicated that requests were improperly flagged for review by political appointees and likely

28   delayed in processing as a result, by the Department of Homeland Security's unlawful policy.

This is a violation of the FOIA's statutorily mandated deadlines for processing requests pursuant to 5 U.S.C. 5S2(a)(6)(A), (B).

## **BACKGROUND**

The Plaintiff is a retired United Stated Federal Air Marshal ("FAM") who was previously employed by the government Defendant. As a FAM, the Plaintiff's duties entailed being deployed on commercial aircraft to detect, deter, and defeat hostile acts of terrorism targeting U.S. airlines, airports, crews, and passengers. Plaintiff is currently the elected president of the Federal Law Enforcement Officers Association, Nevada State Chapter, which represents all federal law enforcement officers throughout the state of Nevada.

On February 25, 2002, the Plaintiff accepted a position as a FAM with the Federal Aviation Administration, just five months after the attacks on the World Trade Center towers. At that time, the Federal Air Marshal Program was under the jurisdiction of the Department of Transportation, Federal Aviation Administration. On or about October 1, 2003, the Federal Air Marshal Service ("FAMS") was transferred and placed under the jurisdiction of the Department of Immigration and Customs Enforcement ("ICE"). On or about October 1, 2005, the Federal Air Marshal Service was again transferred, and placed under the jurisdiction of the Transportation Security Administration — where it remains today.

Currently, federal employees of the Transportation Security Administration, including federal law enforcement officers within the Federal Air Marshal Service, may file grievances and non-criminal complaints of employee misconduct with the TSA Office of Inspection. But between 2003 and 2005, while under the jurisdiction of ICE, employees of the Federal Air Marshal Service had to file grievances and complaints of employee misconduct with the ICE Office of Professional Responsibility ("OPR"). OPR has a mixed-function where it conducts both criminal investigations, *and non-criminal administrative investigations* regarding employee violations of agency regulations and policies that would result in disciplinary action of agency employees found to have engaged in misconduct.

: : :

On August 4, 2004, MSNBC Chief Washington Correspondent Brock Meeks released an expose' story entitled, *Air Marshals Struggle with Growing Pains*, detailing alleged mismanagement and malfeasance throughout the Federal Air Marshal Service. [EXHIBIT 16]. The article exposed numerous confidential internal email messages from the Las Vegas field office, regarding "the relative autonomy given to the field offices may have allowed some air marshal officials to overstep their authority by instituting an unauthorized quota system for intelligence reporting." The FAMS spokesperson immediately released a statement denying the allegations, while the agency immediately began a witch-hunt to uncover who had released the internal emails.

On August 6, 2004, two days after the publication of the Meeks MSNBC article, the Plaintiff was taken off mission flying status and immediately called into the field office and interrogated for the suspicion of releasing Sensitive Security Information to the media. The interrogation was conducted by David Knowlton, the Special Agent-in-Charge (Senior Executive Service) of the Las Vegas field office, and by Gregory Korniloff, the Assistant Special Agent-in-Charge (GS-15). The Plaintiff's immediate supervisor was Charles Maurer, the Assistant to the Special Agent-in-Charge (GS-14).

All three **high-level supervisory managers** were contract "annuitants" who had previously retired from federal employment, but were rehired into federal service on a time-limited basis, to assist with the stand-up of the new Federal Air Marshal Program. The three supervisory managers did not believe the Plaintiff when he repeatedly swore he was not responsible for the leak of Sensitive Security Information to the media. In fact, the individual who *was* ultimately responsible for leaking sensitive information to the MSNBC reporter was FAM Robert MacLean, and according to his Proposal for Removal from Federal Service letter [EXHIBIT 17], after numerous and extensive internal investigations completed by ICE-OPR, MacLean was eventually terminated from the Federal Air Marshal Service on April 11, 2006. Even after the Plaintiff received continuous and open harassment and beratement from the three supervisory managers for several months after the leak incident to the media, FAM MacLean never came forward to admit he was the leaker of the sensitive information to MSNBC —

which would have exonerated the Plaintiff of any wrongdoing.

After enduring several months of a hostile work environment, the Plaintiff decided that if he was going to be punished and blackballed in the Las Vegas field office as a leaker and whistleblower, he might as well become a bone-fide whistleblower, thereby he would fall under the protections of the Whistleblower Protection Act. 5 U.S.C. § 1213.   Unfortunately, federal employees who are *falsely* accused and subsequently retaliated against for whistleblowing that they never engaged in, are not protected under any laws or the whistleblower protection statues. Therefore, on August 24, 2004, the Plaintiff flew to Washington, D.C. and gave sworn testimony to Congressional members of the House Judiciary Committee, exposing dangerous agency internal policies that promoted aviation security breaches and conditions, that seriously jeopardized the health and safety of Federal Air Marshals, flight crews, and airline passengers.

On August 26, 2004, just two days after the Plaintiff gave testimony to members of Congress, the Director of the Federal Air Marshal Service, Thomas Quinn, knowingly filed a frivolous complaint with the ICE Office of Professional Responsibility, accusing the Plaintiff of intentionally releasing Sensitive Security Information to the media, in retaliation for the Plaintiff's whistleblower disclosure to the House Judiciary Committee.   On December 6, 2004, investigators with the ICE Office of Professional Responsibility arrived to the Las Vegas field office and interrogated the Plaintiff in regards to the complaint filed by the Director.   At that time, the Plaintiff officially filed a written counter-complaint against the three high-ranking supervisory managers and the Director of the Federal Air Marshal Service, for whistleblower retaliation, gross mismanagement, Prohibited Personnel Practices (5 U.S.C. § 2302), and hostile work environment. [EXHIBIT 18].

The Plaintiff's written counter-complaint was assigned to the San Diego field office of the ICE Office of Professional Responsibility.   Assistant Special Agent-in-Charge James Wong oversaw the entire investigation.   In March of 2005, investigators from the ICE-OPR San Diego field office arrived to the FAMS Las Vegas field office and began their investigation by interviewing witnesses.   The OPR investigation lasted three months, and on June 23, 2005, the Plaintiff was flown, at government expense, to meet with ASAC James Wong at the ICE-OPR

1  San Diego field office.  In the meeting, ASAC Wong gave the Plaintiff an extensive summary

2  of the investigation, concluding that the Plaintiff's complaint *was founded and had merit*, and

3  that supervisory managers would be receiving disciplinary action. ASAC Wong further

4  indicated that the Plaintiff should contact OPR Headquarters in Washington, D.C. to obtain a

5  copy of the final administrative Report of Investigation (ROI).

6        On January 6, 2006, Special Agent-in-Charge David Knowlton, resigned from the

7  Federal Air Marshal Service. In April 2006, just weeks before the House Judiciary Committee

8  released their damaging investigative report, "*In Plane Sight*," based in part on the Plaintiff's

9  sworn testimony, Thomas Quinn resigned as Director of the Federal Air Marshal Service.

10  

11                             **ARGUMENT**

12        This case involves two requests filed by the Plaintiff under the Freedom of Information

13  Act ("FOIA"), 5 U.S.C. § 552.  At issue is whether non-criminal administrative "Reports of

14  Investigation", or "ROI's" completed by the Immigration and Customs Enforcement, Office of

15  Professional Responsibility, are subject to release. To date, most courts have reached this issue

16  and have concluded that the requested documents must be processed in response to a properly

17  submitted FOIA request.  In FOIA litigation, as in all litigation, summary judgment is

18  appropriate only when the pleadings and declarations demonstrate that there is no genuine issue

19  of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson*

20  *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); Fed.R.Civ.P. 56(c). In FOIA cases, agency

21  decisions to "withhold or disclose information under FOIA are reviewed de novo by this court."

22  *Judicial Watch, Inc. v. U.S. Postal Service*, 297 F. Supp. 2d 252, 256 (D.D.C. 2004). In

23  reviewing a motion for summary judgment under FOIA, a court must view the facts in the light

24  most favorable to the requestor. *Weisberg v. Department of Justice*, 745 F.2d 1476, 1485 (D.C.

25  Cir. 1984).  As no legitimate disputes of material fact exist as to the nature or proper definition

26  of non-criminal administrative "Reports of Investigation," summary judgment as to this

27  straightforward legal issue should be issued immediately for the release of the requested

28  documents to the Plaintiff — that being **any and all "Reports of Investigation" or "ROI's"**

that were generated as a result of an administrative investigation, that was conducted by the ICE Office of Professional Responsibility, in response to the written counter-complaint filed by the Plaintiff on or about December 6, 2004.

Defendants' original search and production of documents was disorganized and insufficient. Nearly every document of note was subsequently withheld in full pursuant to three purported exemptions to the FOIA: 1) Exemption (b)(2) regarding records that are related solely to the internal personnel rules and practices of an agency; 2) Exemption 6 personnel and medical files and similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy; and 3) Exemption 7 regarding protection of records or information for law enforcement purposes, which could reasonably interfere with law enforcement proceedings, could be expected to constitute an unwarranted invasion of privacy, or could disclose techniques for law enforcement investigations. The government Defendant's Answer and *Vaughn* index's, which encompass boilerplate and conclusory responses, fail to provide a reasoned explanation as to how the cited exemptions apply to the requested information, and make it virtually impossible for the Plaintiff to test the legitimacy of the withholdings.

Given the presumption of disclosure, the government Defendants' ***four-year delay*** and subsequent production of mostly redacted irrelevant pages during this litigation is untenable. At a minimum, FOIA compels the partial disclosure of segregable sections of the requested material. It is time for this Court to examine the documents *in camera* review, and to order disclosure of the requested administrative Reports of Investigation the Plaintiff seeks.

## I.   Defendant's Arguments Insufficient to Support Withholding Under Exemption 6

Under the FOIA, "privacy encompasses the individual's control of information concerning his or her person." Exemption 6 protects information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy. In order to determine whether Exemption 6 protects against disclosure, the government must have engage in the following two lines of inquiry: first, determine whether the information at issue is contained in a

1    personal, medical, or "similar" file covered by Exemption 6; and, if so, determine whether

2    disclosure "would constitute a clearly unwarranted invasion of personal privacy" by balancing

3    the privacy interest that would be compromised by disclosure against any public interest in the

4    requested information. 5 U.S.C. § 552(b)(6).

5        When engaging in this analysis, it is important to remember that the Court of Appeals

6    for the District of Columbia Circuit has declared that "'under Exemption 6, the presumption in

7    favor of disclosure is as strong as can be found anywhere in the Act . . . we must determine

8    whether disclosure would compromise a substantial, as opposed to a de minimis privacy

9    interest " *Multi Ag Media LLC v. Department of Agriculture*, 515 F.3d at 1227, 1229 (quoting

10   *National Association of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)); see also

11   *Consumers' Checkbook Center for the Study of Services v. Department of Health and Human*

12   *Services*, 554 F.3d 1046, 1057 (D.C. Cir. 2009) (stating that FOIA's "presumption favoring

13   disclosure . . . is at its zenith under Exemption 6"); *Lawyers' Commission for Civil Rights of*

14   *San Francisco Bay Area v. Department of the Treasury*, No. 07-2590, 2008 WL 4482855, at 20

15   (N.D. Cal. Sept. 30, 2008) ("The burden remains on the agency to justify any withholdings

16   under Exemption 6, since the presumption in favor of disclosure under this exemption is as

17   strong as that with other exemptions.").

18       The Defendant in this case has claimed in its defense, that the Plaintiff seeks production

19   of documents that are not subject to disclosure under Exemption 6. The Plaintiff contends that

20   none of the exclusions described in Exemption 6 apply specifically to the documents the

21   Plaintiff is requesting (administrative Reports of Investigation), since none of the documents

22   requested, pertain to any one individual contained within "personnel and medical files and

23   similar files," and that none of the documents requested would constitute a clearly unwarranted

24   invasion of personal privacy.

25

26   **A.    Disclosure of Personnel and Medical Files**

27       In the *Department of the Air Force v. Rose*, 425 U.S. 352 (1976), the Supreme Court

28   held that the phrase "the disclosure of which would constitute a clearly unwarranted invasion of

1 | personal privacy" modifies "personnel and medical files."  The statute's reference to personnel
2 | and medical files is merely illustrative.  Congress did not intend any *per se* exemption for these
3 | types of files, but intended that their contents be subjective to a balancing test. *Id.* 370.

4 |      The numerous documents the Plaintiff seeks in this case, are non-criminal administrative
5 | "Reports of Investigations" or "ROI's" that are held in the files of the ICE Office of
6 | Professional Responsibility ("OPR"), and are not documents or files found in any personnel or
7 | medical system of records — which would normally be found in the human resource office of
8 | the Transportation Security Administration — for supervisory managers and other employees
9 | of the Federal Air Marshal Service

## B. Disclosure of Similar Files

In *Department of State v. The Washington Post*, 456 U.S. 595, 599-600 (1982), the Supreme Court firmly announced that the phrase "similar files" is to have "a broad, rather than narrow, meaning" and that is it "the balancing of private against public interests, not the nature of the files," that governs the applicability of Exemption 6.  The Court concluded that Congress intended Exemption 6 to cover "***detailed government records specifically on an individual,*** which can be identified as applying to that individual" (emphasis added), rather than just "a narrow class of files containing only a discrete kind of personal information."

In *Viacom International Inc. v. Environmental Protection Agency*, No. 95-2243, 1995 U.S. Dist. LEXIS 17469, the court held that records of EPA soil testing, including the names and addresses of persons residing where samples were collected, were not "similar files" because they were not ***detailed*** records about individuals (emphasis added). See also *Viacom*, No. 95-2243, 1996 U.S. Dist. LEXIS 1069 (E.D. Pa. January 29, 1996) (rejecting EPA's motion to reconsider).  In *Commodity News Service, Inc. v. Farm Credit Administration*, No. 88-3146 (HHG), 1989 U.S. Dist. LEXIS 8848 (D.D.C. July 31, 1989), the court held that proposals prepared by an individual for previous employers were not considered "similar files" because the information they contain is not "personal data."  See also *Greenpeace U.S.A. Inc. v. Environmental Protection Agency*, 735 F. Supp. 13, 14 (D.D.C. 1990) (reports relating to a

federal employee's participation at privately sponsored meetings, are not subject to withholding under Exemption 6, because the reports "do not go into personal information about" the federal employee).

The administrative "Reports of Investigation" or "ROI's" the Plaintiff seeks in this case, are nothing more than summaries of a detailed administrative inquiry and systematic examination, that was conducted in response to an official complaint by a subordinate federal employee (the Plaintiff), detailing reprisal for his whistleblower disclosures and giving sworn testimony to members of Congress. What little "personal information" may exist in these administrative Reports of Investigation, *if any*, can easily be redacted from the reports prior to their release to the Plaintiff, but nevertheless, it is highly unlikely any such *detailed* personal information or "personal data" even exists in the administrative reports the Plaintiff seeks.

## C.   Disclosure A Clearly Unwarranted Invasion of Personal Privacy

The substantive test for Exemption 6 — whether a disclosure would constitute a clearly unwarranted invasion of personal privacy — requires "a balancing of the individual's right of privacy against the preservation of the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.'" *Department of the Air Force v. Rose*, 425 U.S. 352, 372 (1976); *accord Department of State v. Ray*, 502 U.S. 164 (1991). The phrase "clearly unwarranted," in the exemption "instructs the court to tilt the balance in favor of disclosure." *Getman v. NLRB*, 450 F.2d 670, 674, (D.C. Cir. 1971), *stay denied*, 404 U.S. 1204 (1971). See also *Department of the Air Force v. Rose*, 425 U.S. 352, 378 n.16 (1976) (the phrase "clearly unwarranted" is the major restraining feature of Exemption 6, which controls the ability of the agency to withhold information); *United Association of Journeyman & Apprentices of Plumbing & Pipefitting Industries, Local 598 v. Department of Army Corps of Engineers*, 841 F.2d 1459, 1463 (9th Cir. 1988) ("particularly under Exemption 6, there is a strong presumption in favor of disclosure"); *Department of the Air Force v. FLRA*, 838 F.2d 229 (7th Cir. 1988) ("The FOIA's status as a disclosure law has led the Supreme Court to read Exemption 6 with strong emphasis on 'clearly unwarranted'"), *cert. dismissed*, 488 U.S. 880

(1988), *overruled on other grounds, Department of the Navy v. FLRA*, 975 F.2d 348 (7th Cir. 1992); See also *Avondale Industries, Inc. v. NLRB*, 90 F.3d 955, 960 (5th Cir. 1996) ("The burden is on the government to establish that invasion of privacy is clearly unwarranted."); *Kurzon v. Department of Health & Human Services*, No. Civ. 00-395-JD, 2001 WL 821531, at *11 (D.N.H. July 17, 2001) (ordering disclosure where the privacy and public interests were "at near equipoise").

For Exemption 6 to support withholding in this case, as the government Defendant erroneously claims it does, the privacy invasion of the three FAMS supervisory managers, who have been publicly accused of being malefactors by the Plaintiff in the relevant administrative reports of investigations being sought, ***must be tangible and substantial***; that is, "Exemption 6 was directed at threats to privacy interests more palpable than mere possibilities." *Department of the Air Force v. Rose*, 425 U.S. 352, 380 n. 19 (1976);  See also *National Association of Retired Federal Employees v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989) (privacy interest at stake must be significant or substantial, *cert. denied*, 494 U.S. 1078 (1990).  Additionally, the First Circuit has said that the case in which "the calculus unequivocally supports withholding is a rare case, because Congress has weighted the balance so heavily in favor of disclosure . . ." *Kurzon v. Department of Health & Human Services*, 649 F.2d 65, 67 (1st Cir. 1981).  See also *The Washington Post Company v. Department of Health & Human Services*, 690 F.2d 252, 261 (D.C. Cir. 1982) ("Under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act.").

The language of the Supreme Court in *Department of State v. The Washington Post*, 456 U.S. 595, 600 (1982), emphasizes "personal" over "intimate," and suggests that information is "personal" when it may cause clear harm to an individual — but a footnote suggests, however, that there is some information that is "not personal" to anyone, that may embarrass certain individuals if disclosed, and that information would not be covered by Exemption 6. *Id*. At 602 n.4; See also *Schell v. Department of Health & Human Services*, 843 F.2d 933, 939 (6th Cir. 1988) ("without more, the disclosure of a document will not constitute a clearly unwarranted invasion of personal privacy, simply because it would invite a negative reaction or cause

embarrassment in the sense that a position is thought by others to be wrong or inadequate.").

The 9th Circuit Court has stated that the inherent privacy interests of government public officials *and civil servants who took an oath*, are not as strong as those of private citizens. See *Lissner v. United States Customs Service*, 241 F.3d 1220, 1223 (9th Cir. 2001) ("It is true that individuals do not waive all privacy interests in information relating to them simply by taking an oath of public office, . . . but by becoming public officials, their privacy interests are somewhat reduced."); See also *Kimberlin v. Department of Justice*, 139 F.3d 944 (D.C. Cir. 1998) (government officials and high ranking federal employees may have "somewhat diminished" privacy rights.)  Courts in fact have released information containing the names of federal employees working for federal law enforcement agencies, when there was no real substantial evidence of privacy interest.

In *Lawyers' Committee for Human Rights v. Immigration & Naturalization Service*, 721 F. Supp. 552 (S.D.N.Y. 1989), information was released to the requester when no substantial evidence of a privacy interest was found; and in *LaRouche v. Department of Justice*, No. 90-2753 (HHG), 1993 U.S. Dist. LEXIS 9412 (D.D.C. June 25, 1993), where there was no demonstrated privacy interest found in the names of federal employees working for the Department of Justice; and in *Dobronski v. Federal Communications Commission*, 17 F.3d 275, 280 (9th Cir. 1994), where the court released the official attendance records of government employees, indicating their leave and vacation data, since the privacy interest of the federal employees were "minimal at best."

And lastly, and most importantly, in the more recent case *Judicial Watch, Inc. v. United States Department of Homeland Security*, 598 F. Supp. 2d 93 (D.D.C. 2009), where the court release investigative material and information on the *criminal prosecution* of two United States Border Patrol Agents for shooting a Mexican drug smuggler in violation of federal law.  The court stated that "these records could well be suffused from top to bottom with information about DOJ's performance of its duties."  Judge Richard Leon added that "such information, to say the least, *goes to the very heart of FOIA's purpose.* (emphasis added).

**D.     The Public Interest in Disclosure**

According to the Supreme Court in *Rose*, privacy is to be balanced against "the preservation of the basic purpose of the Freedom of Information Act 'to open the agency to the light of public scrutiny.'" *Department of the Air Force v. Rose*, 425 U.S. 352, 372 (1976). More specifically, "the purpose of the FOIA is to permit the public to decide for itself whether government action is proper . . ." See *International Brotherhood of Electric Workers, Local 41 v. Department of Housing & Urban Development*, 763 F.2d 435, 436 (D.C. Cir. 1985) (citing *The Washington Post Company v. Department of Health & Human Services*, 690 F.2d 252, 264 (1982)); See also *National Association of Atomic veterans, Inc. v. Director, Defense Nuclear Agency*, 583 F. Supp. 1483, 1487 (D.D.C. 1984) (public oversight of government operations provides a public benefit, even if the requesters' efforts overlap the government's in full or in part); *Citizens for Environmental Quality, Inc. v. Department of Agriculture*, 602 F. Supp. 534 (D.D.C. 1984). And the Supreme Court weighed in on a case governing the public interest, in *Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749 (1989), in which the Court stated that the only public interest weighed in the balance against privacy concerns, is FOIA's "core purpose" of contributing to public understanding of government operations and its activities.

**E.     Cases Favoring the Public Interest**

The strongest cases for the public interest are those in which the information will serve to inform the public about agency or ***official employee misbehavior***. For instance, in *Department of the Air Force v. Rose*, 425 U.S. 352 (1976) case summaries of honors and ethics disciplinary proceedings were sought by a law review to assess the workings of a part of the military justice system — a goal the Supreme Court thought to be exceptionally important. *Id.* at 367. And in *Outlaw v. Department of the Army*, 815 F. Supp. 505, 506 (D.D.C. 1993), the court ruled that neither Exemption 6 nor 7(C) permitted ***the withholding of exculpatory information from a requester***, regarding a criminal case that occurred years earlier, since there was "an obvious public interest in the disclosure, as a check on the administration of justice by

the United States Army." Similarly, in *Butler v. Department of Justice*, No. 86-2255, 1994 WL
55621 (D.D.C. February 3, 1994), a district court judge prohibited redaction of the names of
several ***supervisory managers*** of the FBI from records, because the "public interest in seeing
that Mr. Butler's due process rights are protected on this case" was significant and outweighed
unsupported claims regarding privacy interests; and in *Steinberg v. Department of Justice*, 179
F.R.D. 366 (D.D.C. 1998), the court found a "significant" public interest in disclosure of
documents that related to investigation activities. 179 F.R.D. at 370071 (ordering release of
documents describing FBI interviews, after redaction of names and identifying information of
undisclosed agents described in the records.); See also *Goldstein v. Office of Independent
Counsel*, No. Civ. A. 87-2028 (TPJ/JMF), 1999 U.S. Dist. LEXIS 22969 at *34 (D.D.C. July
29, 1999) (public interest in releasing Reports of Investigation detailing the actions and
investigations conducted by the FBI, was "significant" and "substantial.")

Ordering the Defense Department to release many of its reports concerning detainee
abuse allegations at Guantanamo Bay, the court in *The Associated Press v. Department of
Defense*, 34 Media L. Rep. 2251 (S.D.N.Y. 2006), observed that "by redacting the identities of
the abused detainees, DOD has seriously interfered with the ability of the public to engage in
the independent fact-finding necessary to properly evaluate the allegations of abuse and DOD's
response to it."

And most importantly, in *National Association of Criminal Defense Lawyers v.
Department of Justice*, No. 97-CV-372 (GK) (D.D.C. October 1, 1999), the court found an
"extraordinarily significant" public interest, "far outweighing" substantial privacy interests, in
releasing the names of FBI agents, in order to confirm or deny allegations that the agents and
internal investigators ***may have engaged in misconduct***. In *Columbia Packing Company v.
Department of Agriculture*, 563 F.2d 495 (1st Cir. 1977), the First Circuit found a substantial
public interest in the personnel records and actions of two *former* federal employees, because
they had been accused of taking bribes, and their was some suspicion that the practice was
widespread throughout the agency. See also *McLaughlin v. Sessions*, No. 92-0454 (JHG), 1993
U.S. Dist. LEXIS 13817 (D.D.C. September 22, 1993) (where the records sought, related to

specific Reports of Investigation where "plaintiff's interest in the scope and course of the investigation constitutes a recognized public interest.")

In *Bartholdi Cable Company v. FCC*, 114 F.3d 274 (D.C. Cir. 1997), the court agreed that the FCC's decision to release an internal Report of Investigation was supported by a cognizable public interest, because the information was "clearly relevant to the public's understanding of the type of entities to which the government is distributing a valuable public asset." *Id.* at 282. And lastly, in *Cochran v. United States*, 770 F.2d 949, 956 (11th Cir. 1985), the court ruled that "the balance struck under FOIA exemption 6, overwhelmingly favors the disclosure of information ***relating to a violation of the public trust by a government official***, which certainly must include the reported misconduct, mismanagement, and malfeasance of three high-ranking supervisory managers of the Federal Air Marshal Service, who were accused by the Plaintiff in this case of Prohibited Personnel Practices, including whistleblower retaliation against the Plaintiff for his sworn testimony to House Judiciary Committee, where he exposed dangerous agency internal policies that promoted aviation security breaches and conditions, that seriously jeopardized the health and safety of federal air marshals, flight crews, and airline passengers — being without a doubt an extraordinarily significant public interest.

**F.    Disclosure based on the Need for Oversight of Government Activity**

A central purpose of the FOIA is to "check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Company*, 437 U.S. 214, 242 (1978); Indeed, disclosure of information that would inform the public of violations of the public trust, serves a strong public interest and is accorded great weight in the balancing process. As the Tenth Circuit has held, "[t]he public interest in learning of a government employee's misconduct increases as one moves up an agency's hierarchical ladder." As a general rule, demonstrated wrongdoing of a serious and intentional nature by a high-level government official is of sufficient public interest to outweigh almost any privacy interest of that government official. The public interest in disclosure is strengthened when the requester presents evidence of governmental wrongdoing to which the records may relate. See *The*

*Washington Post Company v. Department of Health & Human Services*, 690 F.2d 252, 264 (D.C. Cir. 1982) (recent allegations and investigations against the same subject as FOIA request, magnify public interest in disclosure.) See also *The Washington Post Company v. Department of Agriculture*, 943 F. Supp. 31, 36 (1996) (plaintiff "identified allegations of fraud and conflict of interest, supported by government reports of investigation . . . were sufficient to raise non-speculative questions about the workings of the USDA"). And in *Computer Professionals for Social Responsibility v. Secret Service*, 72 F.3d 897, 905 (D.C. Cir. 1996) ("When governmental misconduct is alleged as the justification for disclosure, the public interest is insubstantial, unless the requester puts forward compelling evidence that the agency denying the FOIA request is engaged in unlawful activity, and shows that the information sought is necessary in order to confirm or refute that evidence.")

The D.C. Circuit has held that there is likely to be a strong public interest in disclosure of names of federal employees when the case has already "occurred against the backdrop of a well publicized scandal" that has resulted in "widespread knowledge" that certain agency employees were under investigation and later disciplined for misconduct or gross mismanagement. *Beck v. Department of Justice*, 997 F.2d 1489, 1493 (D.C. Cir. 1993);  see also *Chin v. Department of the Air Force*, No. 97-2176, slip op. at 3 (W.D. La. June 24, 1999)

On December 12, 2007, aviation security reporter Annie Jacobsen released an explosive article in Pajamas Media entitled *American Downfall* [EXHIBIT 19], which documented numerous allegations of corruption perpetrated by FAMS Las Vegas field office Assistant Special Agent-in-Charge Gregory Korniloff. This highly publicized article described how employees witnessed Korniloff's managerial staff "shredding documents like crazy" just prior to the arrival of the investigators from the ICE Office of Professional Responsibility. And on February 26, 2008, another article by Annie Jacobsen entitled, *Why Have 67,000 TSA Employees Left Their Job?* [EXHIBIT 20], reported how the Plaintiff's immediate supervisor, Assistant to the Special Agent-in-Charge Charles Maurer "was conducting an extrajudicial and unauthorized investigation" on the Plaintiff, in retaliation for his whistleblower testimony to Congress.

1        Even the filing of this FOIA lawsuit has gotten its fair share of widespread publicity.  On

2  December 4, 2010, Las Vegas Review Journal reporter Alan Maimon wrote an article entitled

3  *Agency Won't Release Air Marshal Report* [EXHIBIT 21], in which he reports that in addition

4  to the Plaintiff, Arizona Congressional Representative Gabrielle Gifford has been trying

5  unsuccessfully for over a year to obtain a copy of ICE-OPR's numerous administrative Reports

6  of Investigation, regarding the investigation of supervisory managers at the FAMS Las Vegas

7  field office.  The article goes on to quote whistleblower rights attorney Tom Devine, the Legal

8  Director of the Washington-based Government Accountability Project (GAP), who states,

9  "Alleged misconduct in the Las Vegas field office, even if it occurred several years ago, needs

10 to come to light. The report [of investigation] could expose the secret history of a government

11 agency that may have set the pace for betraying the public trust."

12

13 **G.     Meaningful and Reasonable Evidence of Wrongdoing**

14       Any asserted "public interest" in the disclosure of mere allegations of wrongdoing

15 cannot outweigh an individual's privacy interest in avoiding unwarranted association with such

16 allegations. See, e.g., *Sussman v. United States Marshal Service*, 494 F.3d 1106, 1115 (D.C.

17 Cir. 2007) (finding that USMS properly protected the privacy of various individuals stressing

18 that "while we find [plaintiff] did in fact allege misconduct, his bare and undeveloped

19 allegations would not warrant a belief by a reasonable person that impropriety might have

20 occurred") (Exemption 7(C)); and in *McCutchen v. Department of Health & Human Services*,

21 30 F.3d at 187-189 (D.C. Cir. 1994) (protecting identities of scientists found not to have

22 engaged in alleged scientific misconduct) (Exemption 7(C)); See also *Bullock v. Federal

23 Bureau of Investigation*, 587 F. Supp. 2d 250, 253 (D.D.C. 2008) ("Absent any evidence of

24 official misconduct, the identities of law enforcement officials are protected by Exemption 7(C)

25 . . . . Plaintiff's unsupported allegations of official misconduct do not outweigh the privacy

26 interests of these law enforcement officials.") (Exemption 7(C)); and in *Barbosa v. Drug

27 Enforcement Administration*, 541 F. Supp. 2d 108, 111-12 (D.D.C. 2008) (stating that plaintiff

28 must present "'more than a bare suspicion of official misconduct;  rather, the requester must

produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred . . . For it is 'only when [such evidence is] produced [that] there [will] exist a counterweight on the FOIA scale for the court to balance against the cognizable privacy interests in the requested records'" (quoting *NARA v. Favish*, 541 U.S. at 174-75)); and in *McQueen v. United States*, 264 F. Supp. 2d 502, 533-34 (S.D. Tex. 2003) (deciding that public interest would not be served by "disclosure of information regarding unsubstantiated allegations" made against three government employees) (Exemptions 6 and 7(C)), aff'd, 100 F. App'x 964 (5th Cir. 2004) (per curiam).

In *Favish*, the Supreme Court held that mere allegations of wrongdoing are "insufficient" to satisfy the "public interest" standard required under the FOIA. The Court observed that if "bare allegations" could be sufficient to satisfy the public interest requirement, then the exemption would be "transformed . . . into nothing more than a rule of pleading." U.S at 174. Indeed, the Supreme Court has opined that if mere unsubstantiated allegations by a requester were all that were necessary to override a personal privacy interest, then that privacy interest would become worthless. See *Department of State v. Ray*, 502 U.S. 164, 179 (1991) ("If a totally unsupported suggestion that the interest in finding out whether Government agents have been telling the truth, justified disclosure of private materials, Government agencies would have no defenses against requests for production of private information.").

Moreover, the Supreme Court in *Favish* pointedly recognized that unsubstantiated "allegations of misconduct are 'easy to allege and hard to disprove,'" and that courts therefore must require a "meaningful evidentiary showing" by the FOIA requester. 541 U.S. at 175; See *Martin v. Department of Justice*, 488 F.3d at 458 (concluding that "'unsubstantiated assertions of government wrongdoing . . . do not establish a meaningful evidentiary showing'" (quoting *Boyd v. Department of Justice*, 475 F.3d 381, 388 (D.C. Cir. 2007))); see also *Jarvis v. Bureau of Alcohol Tobacco & Firearms*, No. 07-111, 2008 WL 2620741, at *13 (N.D. Fla. June 30, 2008) ("When the significant asserted public interest is to uncover Government misfeasance, there must be a meaningful evidentiary showing."). Therefore, the Court adopted a higher standard for the evaluation of "agency wrongdoing" claims and held that "the requester must

establish more than a bare suspicion in order to obtain disclosure. Rather, ***the requester must produce evidence to the court that would warrant a belief by a reasonable person, that the alleged Government impropriety might have occurred.***" (emphasis added).

On November 25, 2008, the Washington, D.C. based non-profit government watchdog organization Project On Government Oversight, completed an extensive investigative report entitled *Breaking the Sound Barrier: Experiences of Air Marshals Confirm Need for Reform*, (http://tinyurl.com/5wscc9t), which extensively detailed the handling of several Federal Air Marshal whistleblower cases, including the Plaintiff's.  The report stated in part:

"In August 2004, FAMS management initiated a seemingly retaliatory
year-and-a-half-long investigation into Federal Air Marshal P. Jeffrey Black
for allegedly unauthorized release of SSI. Just before the investigation was
launched, Black had testified before the House Judiciary Committee about
internal FAMS policies that promoted aviation security breaches, such as
professional dress code requirements, the submission of false surveillance
intelligence reports, the use of a dangerous type of ammunition, and the
large number of unaddressed instances in which suspicious passengers
had been observed surveying passengers and crews (probing) while aboard
commercial flights. The ICE OPR determined that FAMS' allegations
against Black were "unfounded."

Such ***substantiated evidence of retaliation and misconduct*** are not isolated events in the Las Vegas field office, or throughout the Federal Air Marshal Service. After a two year investigation, the House Judiciary Committee, based in part from the Plaintiff's sworn testimony given in 2004, revealed a pattern of retaliatory behavior in its 2006 report, *Plane Clothes: Lack of Anonymity at the Federal Air Marshal Service Compromises Aviation.* (http://www.fas.org/sgp/congress/2006/plane.pdf).

Interviewing more than 30 air marshals from the Washington, Boston, Chicago, Atlanta, Houston, Los Angeles, Las Vegas, and Dallas field offices, the congressional investigators found that most of the federal air marshals:

"indicated a reluctance to approach supervisors with these concerns for fear

of retaliation that included being given difficult scheduling assignments and

being required to wash FAMS vehicles and paint field office walls."

And in the DHS Inspector General's report of investigation entitled *Review of Alleged Actions*

*by Transportation Security Administration to Discipline Federal Air Marshals for Talking to*

*the Press, Congress, or the Public* (http://www.fas.org/sgp/othergov/dhs-ig-ssi.pdf ), the IG

identified evidence where threats may have been "excessive," explaining that:

"Five air marshals, from two field offices, said they were threatened with

prosecution for disclosing information to the press or public. They said their

supervisors' threats included being led away in handcuffs, being arrested and

prosecuted, or being subjected to polygraph exams if the leaks continued."

**H.     Privacy Expectations of Government Employees**

The threshold of Exemption 6  has been found not to be met when the information

cannot be linked solely to a particular individual, or when the information pertains to federal

government employees, but is not specifically personal in nature. *See Aguirre v. Securities &*

*Exchange Commission*, 551 F. Supp. 2d 33, 54 (D.D.C. 2008) ("Correspondence does not

become personal solely because it identifies government employees."); and *Leadership*

*Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 257 (D.D.C. 2005) (finding that

the names and work telephone numbers of Justice Department paralegals do not meet the

threshold for Exemption 6 on the basis that information is not "similar to a 'personnel' or

'medical' file"), *motion to amend denied*, 421 F. Supp. 2d 104, 107-10 (D.D.C. 2006), *appeal*

*dismissed voluntarily*, No. 06-5055, 2006 WL 1214937 (D.C. Cir. Apr. 28, 2006); See also

*Gordon v. Federal Bureau of Investigation*, 390 F. Supp. 2d 897, 902 (N.D. Cal. 2004)

(deciding that names of agency employees are not personal information about those employees

that meets Exemption 6 threshold), *summary judgment granted*, 388 F. Supp. 2d 1028, 1040-42

(N.D. Cal. 2005) (concluding that Exemption 6 does not apply to the names of the agency's

"lower-level" employees, and likewise opining that "[t]he [agency] still has not demonstrated

that an employee's name alone makes a document a personnel, medical or 'similar file'"); and

*Darby v. Department of the Air Force*, No. 00-0661, slip op. at 10-11 (D. Nev. Mar.1, 2002)

(rejecting redaction of names in an Inspector General Report of Investigation, on basis that such

documents "are not 'personnel or medical files, "nor are they 'similar' to such files"), *aff'd on*

*other grounds sub nom. Darby v. Department of Defense*, 74 F. App'x 813 (9th Cir. 2003);

*Providence Journal Company v. Department of the Army*, 781 F. Supp. 878, 883 (D.R.I. 1991)

(finding Report of Investigation detailing criminal charges not to be "similar file," on basis that

it was "***created in response to specific allegations***" rather than as "regularly compiled

administrative record") (emphasis added), 981 F.2d 552 (1st Cir. 1992); See also *Greenpeace*

*USA, Inc. v. Environmental Protection Agency*, 735 F. Supp. 13, 14 (D.D.C. 1990) (opining

that information pertaining to an employee's compliance with agency regulations regarding

outside employment "does not go to personal information . . . even in view of the broad

interpretation [of Exemption 6] enunciated by the Supreme Court").

    While government employees and supervisory managers do not have the same

expectations of privacy as do non-government individuals, the fact that an individual works for

the government does not necessarily diminish his or her expectation of privacy, but in *Stern v.*

*Federal Bureau of Investigation*, 837 F.2d 84 (D.C. Cir. 1984), the court distinguished privacy

expectation of federal employees based on the level of authority of individual employees.  The

court ordered disclosure of names of several ***high-ranking FBI supervisory agents*** involved in

a scandal, finding that disclosure of their identities was in the public interest, but declined to

order disclosure of the identities of lower level employees who did not exercise any authority

over the improper or unlawful behavior. See also *Hardy v. Department of Defense*, No. CV-99-

523-TUC-FRZ, slip op. at 15 (D. AZ August 27, 2001) (a federal employee's position and level

of responsibility are relevant in determining the extent of the public's interest).

    A decision by the 11th Circuit Court, before the decision in *Department of Justice v.*

*Reporters Committee for Freedom of the Press*, 489 U.S. 749 (1989), followed *Stern's* analysis

in giving great weight to the need to expose perceived violations of the public's trust.  In

ordering disclosure of the identity of a high-ranking military officer involved in a scandal, the

1    court observed that "courts favor disclosure under the FOIA balancing test *when a government*

2    *official's actions constitute a violation of the public's trust* . . . We agree that the balance

3    struck under FOIA Exemption 6 overwhelmingly favors the disclosure of information relating

4    to a version of the public trust by a government official" (emphasis added).  *Cochran v. United*

5    *States*, 770 F.2d 949, 956 (11th Cir. 1985). Other courts have also been very willing to order

6    disclosure of allegations about misconduct based upon the supervisory position of a

7    government employee, for example, in *Providence Journal Company v. Department of the*

8    *Army*, 981 F.2d 552, 568 (1st. Cir. 1992), the court stated "In virtually all cases . . . disclosure

9    of the information adduced in an agency investigation [of alleged employee misconduct] serves

10   the public interest, at least to the extent that it sheds light on the agency's performance of its

11   official duties . . . The higher the rank of the public official alleged to have engaged in

12   misconduct, the greater the legitimate public interest in disclosure is likely to be."

13         The Second Circuit found that more information from an Inspector General Report of

14   Investigation involving the *former* counsel of the Immigration and Naturalization Service, a

15   federal law enforcement agency, should be disclosed because of the attorney's relatively senior

16   position in the agency. *Perlman v. Department of Justice*, 312 F.3d 100 (2d Cir. 2002).  And in

17   *Dobronski v. Federal Communications Commission*, 17 F.3d 275 (9th Cir. 1994), the court

18   ordered the release of reports relating to allegations that a senior official had abused his sick

19   leave. "While we agree that government employees may have some privacy interests in the

20   dates and times they took sick leave . . . *this nominal privacy interest does not overcome the*

21   *public interest in disclosure of official misconduct*" (emphasis added).  See also *Trentadue v.*

22   *Integrity Committee*, 501 F.3d 1215 (10th Cir. 2007) (exemption not applicable to individuals

23   named in an Inspector General Report of Investigation).

24

25   **II.    Defendant's Arguments Insufficient to Support Withholding Under Exemption 7**

26         Exemption 7 of the Freedom of Information Act, protects from disclosure "records or

27   information compiled for law enforcement purposes, but only to the extent that the production

28   of such law enforcement records or information (A) could reasonably be expected to interfere

1    with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an

2    impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion

3    of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential

4    source, including a State, local, or foreign agency or authority or any private institution which

5    furnished information on a confidential basis, and, in the case of a record or information

6    compiled by a criminal law enforcement authority in the course of a criminal investigation, or

7    by an agency conducting a lawful national security intelligence investigation, information

8    furnished by a confidential source, (E) would disclose techniques and procedures for law

9    enforcement investigations or prosecutions, or would disclose guidelines for law enforcement

10   investigations or prosecutions if such disclosure could reasonably be expected to risk

11   circumvention of the law, or (F) could reasonably be expected to endanger the life or physical

12   safety of any individual." 5 U.S.C. § 552(b)(7).

13

14   **A.    Internal Administrative Investigations**

15        Exemption 7 does not apply to information compiled in an agency's general internal

16   monitoring of its own employees to ensure compliance with agency's statutory mandate,

17   policies, and regulations. The internal administrative investigations that were conducted as a

18   result of the Plaintiff's written counter-complaint to ICE-OPR, were not conducted as part of an

19   official law enforcement investigation. An agency's investigation of its own employees is for

20   "law enforcement purposes" only if it focuses directly on specifically alleged criminal acts,

21   illegal acts of particular identified management officials, and acts which could, if proved, result

22   in criminal sanctions against the malefactors. *Stern v. Federal Bureau of Investigation*, 737

23   F.2d 84, 89 (D.C. Cir. 1984) (citing *Rural Housing Alliance v. Department of Agriculture*, 498

24   F.2d 73, 81-82 (D.C. Cir. 1973); *Church of Scientology v. Department of the Army*, 611 F2d.

25   738, 748 (9th Cir. 1979); See also *Hatcher v. Postal Service*, 556 F. Supp. 331 (D.D.C. 1982)

26   (documents acquired in course of routine contract negotiations and oversight developed well

27   before investigation into alleged criminal violations of law are not "compiled for law

28   enforcement purposes").

**B.     Records Compiled for Law Enforcement Purposes**

The Plaintiff is seeking numerous "Reports of Investigation" or "ROI's" that summarize an administrative investigation that was completed in 2005, by the Immigration & Customs Enforcement, Office of Professional Responsibility (OPR), in connection with government oversight of the performance of official duties of three high-ranking supervisory managers in the Federal Air Marshal Service, Las Vegas Field Office, who were accused by the Plaintiff, of Prohibited Personnel Practices and whistleblower retaliation as defined in 5 U.S.C. § 2302. The ICE Office of Professional Responsibility not only conducts criminal investigations of violations of law, but the same office also investigates *non-criminal violations of agency regulations and policies*, that would result in disciplinary action of agency employees found to have engaged in misconduct.  Administrative personnel investigations of agency employees have routinely been found not to have been compiled for law enforcement purposes.

In *Jefferson v. Department of Justice*, 284 F.3d 172 (D.C. Cir. 2000), the Court of Appeals for the District of Columbia Circuit, in clarifying the mixed-function nature of the Department of Justice's Office of Professional Responsibility (OPR), stated that "OPR conducts both law enforcement and non-law enforcement activities," and it then discussed the difference between the two types of files that "government agencies compile: (1) files in connection with government oversight of the performance of duties by its employees, and (2) files in connection with investigations that focus directly on specific alleged illegal acts, which could result in civil or criminal sanction." 248 F.3d 176-177 (citing *Rural Housing Alliance v. Department of Agriculture*, 498 F.2n 73, 81 (D.C. Cir. 1974).

The D.C. Circuit declined to find that all OPR records were compiled for law enforcement purposes, particularly because the "Department's regulations describe OPR as a mixed-function agency with responsibilities that embrace not only investigations of violations of law and breaches of professional standards that may result in civil liability . . . but breaches of internal Department guidelines that may lead to disciplinary proceedings . . . of such non-law violations."  See also *Sakamoto v. Environmental Protection Agency*, 443 F. Supp. 2d 1182, 1194 (N.D. Cal. 2006) (discussing difference between supervision and law enforcement by

explaining that "'if the investigation is for a possible criminal violations of law, then the inquiry is for law enforcement purposes, as distinct from customary surveillance of the performance of duties by government employees'" (quoting *Jefferson*, 284 F.3d at 177)).

Other courts, while according significant deference to criminal law enforcement agencies, have also held that an agency must demonstrate some relationship or "nexus" between the records and a proper law enforcement purpose. See *Kern v. Federal Bureau of Investigation*, No. 94-0208, slip op. at 9 (C.D. Cal. Sept. 14, 1998) (rejecting FBI's Vaughn Index as inadequate because it did not demonstrate nexus between its mandated duty to investigate espionage, and the documents sought by the requestor); If an agency cannot establish a relationship or "nexus" between its activities *and a law enforcement purpose*, or cannot establish a law enforcement purpose, then the compiled records have been found not to satisfy the threshold of Exemption 7.  See, e.g., *Poulsen v. Customs & Border Protection*, No. 06-1743, 2006 WL 2788239, at *6 (N.D. Cal. Sept. 26, 2006) (explaining that while Customs "has a clear law enforcement mandate" and need only establish "'rational nexus between enforcement of a federal law and the document for which an exemption is claimed,'" records that agency generated in response to computer virus "were not created as part of an investigation, or in connection with CBP's enforcement of a federal law" and thus did not satisfy law enforcement threshold (quoting *Church of Scientology v. Department of the Army*, 611 F.2d 738, 748 (9th Cir. 1979)));

Thus, courts continue to distinguish between mere supervision of federal employees for performance of their assigned duties, on one hand, and criminal investigations of federal employees for law enforcement purposes, on the other -- finding repeatedly that "an agency's general monitoring of its own employees to ensure compliance with the agency's statutory mandate and regulations" does not satisfy Exemption 7's threshold requirement.  *Stern*, 737 F.2d at 89 (dictum) (reminding that "it is necessary to distinguish between those investigations conducted 'for a law enforcement purpose' and those in which an agency, acting as the employer, simply supervises its own employees"); see also *Jefferson*, 284 F.3d at 177-78 (ruling that agencies must distinguish between records based on "allegations that could lead to

criminal sanctions" and records "maintained in the course of general oversight of government employees"); and in *Rural Housing Alliance v. Department of Agriculture*, 498 F.2d 73, 81 (D.C. Cir. 1974) (distinguishing between agency oversight of performance of employees and investigations focusing on specific illegal acts of employees); See also *Coleman v. Lappin*, No. 06-2255, 2007 U.S. Dist. LEXIS 47647, at *9 (D.D.C. July 3, 2007) (stating that "nothing in the BOP's motion and supporting documents establishes that the disciplinary records pertaining to a former BOP employee are law enforcement records"); and in *Wood v. Federal Bureau of Investigation*, 312 F. Supp. 2d 328, 345 (D. Conn. 2004) (reiterating that "'investigation conducted by a federal agency for the purpose of determining whether to discipline employees for activity, which does not constitute a violation of law, is not for law enforcement purposes under Exemption 7.'" (quoting *Stern*, 737 F.2d at 90)).

### C.    Non-Law Enforcement Records Used for Law Enforcement Purposes

In *John Doe Agency v. John Doe Corporation*, 493 U.S. 146 (1989), the Supreme Court resolved a split among the circuits on the application of Exemption 7 to information which is originally compiled as part of a routine contractor audit, but subsequently becomes part of an investigatory file compiled for a law enforcement purpose. Justice Harry Blackman, writing for the majority stated: "We thus do not accept the distinction the Court of Appeals drew between documents that originally were assembled for law enforcement purposes and those that were not so originally assembled, but were gathered later for such purpose. The plain language of Exemption 7 does not permit such distinction. Under the statute, documents need only to have been compiled when the response to the FOIA request must be made." 493 U.S. at 155.

Justice Antonin Scalia dissented, noting that the term "compiled for law enforcement purposes" is readily evaded (or illusionary) if it requires nothing more ***than gathering up documents the government does not wish to disclose***, with a plausible law-enforcement purpose in mind. That is a hole one can drive a truck through." 493 U.S. at 163-64 9 (emphasis added). And in *Gould, Inc. v. General Services Administration*, 688 F. Supp. 689, 697 (D.D.C. 1988), a different court had interpreted the same legislative history that was cited in *John Doe*

*Corporation* as simply prohibiting agencies from commingling "otherwise benign materials" with sensitive law enforcement records, in order to withhold those records under Exemption 7. The court concluded that "at no time has the plain meaning of the statute required an exclusive focus on whether records of information were *originally* compiled for law enforcement purposes." Id. at 691 (emphasis in original).  See also *Crowell & Moring v. Department of Defense*, 703 F. Supp. 1004 (D.D.C. 1989).

### D.   Release of Requested FOIA Documents Must Be Harmful

Even if the requested material sought "constitutes records or information compiled for law enforcement purposes," which the Plaintiff contends they do not, the material is not exempt unless disclosure would or could reasonably be expected to cause harm embodied in one or more of Exemption 7's six subsections regarding protected law enforcement interests. Records or information may be withheld if disclosure could reasonably be expected to interfere with law enforcement proceedings.

When there is a concrete prospect of future law enforcement proceedings, documents or portions of the documents may be withheld only if disclosure of information that is unknown to defendants, would impede a criminal law enforcement investigation or harm the government's enforcement case "in the particular proceeding." 120 Cong. Rec. S9330 (daily ed. May 30, 1974) (statement by Michigan Senator Phillip A. Hart). Thus, because the exemption affords protection of information in order to prevent substantial "harm to the government's case in court," the government must demonstrate that the information requested relates to a pending or prospective criminal law enforcement proceeding. See *NLRB v. Robbins Tire & Rubber Company*, 437 U.S. 214 (1978).

In addition to showing that the documents relate to an active, ongoing law enforcement investigation, the government must also demonstrate the ways in which disclosure could reasonably be expected to result in interference to a particular proceeding. See *Campbell v. Department of Health and Human Services*, 682 F.2d 256 (D.C. Cir. 1982); See also *Center for Auto Safety v. Department of Justice*, 576 F. Supp. 739 (D.D.C. 1983).

### E.   Unwarranted Invasion of Personal Privacy

Records of information may be withheld if disclosure could reasonably be expected to constitute an unwarranted invasion of personal privacy.  This exemption, like Exemption 6, ordinarily involves a balancing of the public interest in disclosure against the degree of the invasion of privacy that would result from disclosure. *Lesar v. Department of Justice*, 636 F.2d 472, 486 (D.C. Cir. 1980); *Congressional News Syndicate v. Department of Justice*, 438 F. Supp. 538, 542 (D.D.C. 1977). See also *Department of the Air Force v. Rose*, 425 U.S. at 378-79 n. 16; *Fund for Constitutional Government v. National Archives & Records Service*, 565 F.2d 856, 862 (D.C. Cir. 1981).

The Supreme Court's decision in *Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749 (1989) has substantially revised the accepted approach to determining and balancing "privacy interests" with that of "public interests" under the FOIA. The court held without dissent, that a third party's FOIA request "about a private citizen, can reasonably be expected to invade that citizen's privacy, and that when the request seeks no 'official information' about a government agency, but merely records that the government happens to be storing, the invasion of privacy is 'unwarranted.'" 489 U.S. at 780.

The Court later stated that whether an invasion of privacy is warranted "must turn on the nature of the requested document and its relationship to 'the basic purpose' of the Freedom of Information Act ' to open agency action to the light of public scrutiny,' rather than on the particular purpose for which the document is being requested" 489 U.S. at 772; and that "Congress once again expressed the core purpose of the FOIA as 'contributing significantly to public understanding of ***the operations or activities of the government***'" (emphasis added). The Court concluded, with the exception of a request for information specifically about a particular private citizen, that "official information that sheds light on an agency's performance of its statutory duties falls within FOIA's statutory purpose." See 489 U.S. at 773 & n.21.

Although some courts have held that Exemption 7 protects the identities of federal law enforcement officers and other non-policing making officials involved in investigations, where their interests in not being harassed in the performance of their official duties outweighs the

public interest in disclosure, such privacy protection does not apply across the board for identities of all law enforcement officers, and such privacy protection can be overcome where the **performance and actions of particular management officials is called into question**. See *Castaneda v. United States*, 757 F.2d 1010 (9th Cir. 1985) ("where it appears that the motives or truthfulness of the investigator are in doubt, the public's need for proper supervision and disclosure is necessarily heightened."); *Lesar v. Department of Justice, supra*; *Baez v. Department of Justice, supra*. See also *Compare Cunningham v. Federal Bureau of Investigations*, 501 F. Supp. 898 (D.D.C. 1980) (names of SEC investigators not exempt, since there is public interest in subjecting them to inquiry); *Iglesias v Central Intelligence Agency*, 525 F. Supp. 547 (D.D.C. 1981) (agents may be able to provide valuable information in the context of a related civil suit).

The Second Circuit ruled that a *former* INS general counsel could not expect the same level of privacy in his senior level position that a lower level employee might enjoy. The court also found that the counsel had been accused of wrongdoing. *Perlman v. Department of Justice*, 312 F.3d 100 (2nd Cir. 2002), *vacated and remanded*, 541 U.S. 970 (2004), *reaff'd*, 380 F.3d 110 (2nd Cir. 2002). Judge Gladys Kessler also ruled that a **supervisory attorney** at the Justice Department did not have an expectation of privacy in her alleged mishandling of a request. *Jefferson v. Department of Justice*, No. 01-1418 (GK), 2003 U.S. Dist. LEXIS 26780 (D.D.C. March 29, 2003).

An Exemption 7 claim for the identity of a **supervisory FBI agent** was rejected in *Butler v. Department of Justice*, No. 86-2255, 1994 WL 55621 (D.D.C. February 3, 1994), where the court noted that "FBI agents and other federal law enforcement personnel 'may not have as great a claim to privacy as that afforded ordinarily to private citizens.'" The court added that "the public interest in seeing that the plaintiff's due process rights are protected in his case is significant. Moreover, the defendant has made bald claims, unsupported by any factual evidence, that the release of these names will subject the FBI supervisory personnel to harassment." Id. See Also *United American Financial Incorporated v. Potter*, 667 F. Supp. 2d 49 (D.D.C. 2009).

## F.  Investigative Methods and Techniques

Exemption 7 allows records to be withheld if production would disclose techniques and procedures for *law enforcement investigations and prosecutions*, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law. This provision does not however, exempt all investigative procedures and techniques from disclosure.  In particular, it specifically does not protect *routine* investigative techniques and procedures, already well known to the public, such as ballistic tests, fingerprinting, obtaining witness statements, document analysis, and other forensic and scientific tests or commonly known investigative techniques. This interpretation was not altered by the 1986 amendment. See *Albuquerque Publishing Company v. Department of Justice*, 726 F. Supp. 851, 858 (D.D.C. 1989) (The court ordered the agency to explain further why certain techniques are considered unknown to the public, stating that "Information pertaining to techniques that are commonly described or depicted in movies, popular novels, stories or magazines, or on television" cannot be withheld from release to a requester.

The court even included surreptitious "eavesdropping, wiretapping,, and surreptitious tape recordings and photography" within this category. *Jaffe v. Central Intelligence Agency*, 573 F. Supp. 377, 387 (D.D.C. 1983) (Exemption 7(E) applies to information regarding "obscure or secret techniques"); See also *Dunway v. Webster*, 519 F. Supp. 1059, 1082-83 (N.D. Cal. 1981) (exemption is to be applied only to law enforcement techniques and procedures generally unknown to the public and, absent any explanation from the government, the court would not assume that disclosure would result in revelation of investigative techniques, which were so unique as to warrant exemption). And in *Hildago v. Federal Bureau of Investigation*, 541 F. Supp.2d 250 (D.D.C. 2008), the court rejected the FBI's argument that disclosure of information about payments to an informant would allow criminals to devise ways to drive up costs, and that further stated that Exemption 7 allows "information about law enforcement techniques to be withheld when publication would allow perpetrators to avoid them; it does not allow law enforcement agencies to withhold information simply because it could operate more cheaply in secret." *Id.* at 254.

**III.    The Defendant Must Provide Reasonably Segregable Portion of the Record**

Where the disclosure of an entire record would result in a clearly unwarranted invasion of privacy, the statute requires that the agency must provide "any reasonably segregable portion . . . after deletion of the portions which are exempt." 5 U.S.C. § 552(b).  This provision complements subsection (a)(2) of the statute which provides, as to records required to be published by agencies, that "to the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation or staff manual or instruction."  Accordingly, an agency (or a District Court) must apply the Exemptions 6 and 7 calculus separately with respect to each disputed portion of each document, as its outcome differs from portion to portion. See *Arieff v. Department of the Navy*, 712 F.2d 1462, 1466 (D.C. Cir. 1983) ("The exemptions of the FOIA do not apply wholesale.  An item of exempt information does not insulate from disclosure the entire file in which it is contained, or even the entire page on which it appears.") See also *Lame v. Department of Justice*, 654 F.2d 917, 923 (3rd Cir. 1981).

A requester's willingness to accept non-personally identifiable data may help substantially in overcoming an Exemption 6  and 7 claim. For example, the segregability issue was a major one for the Supreme Court in *Rose*.  It was ultimately resolved by the majority in favor of segregation and subsequent release of the records. *Department of the Air Force v. Rose*, 425 U.S. 352, 375, 378-82 (1976).  See also *Department of State v. Ray*, 502 U.S. 164 (1991) (upholding release of records concerning dismissed disciplinary investigations after deletion of information, which would identify the subject of the investigation.);  And in *Norwood v. Federal Aviation Administration*, 993 F.2d 570, 575 (6th Cir. 1993) (upholding the release of information regarding the reinstatement of air traffic controllers involved in illegal strike after redaction of personal identifying information).

**IV.    Defendant Set Precedence By Releasing Similar Documents to the Plaintiff**

On March 28, 2006, the Plaintiff sent to the Immigration and Customs Enforcement a FOIA and Privacy Act request for information [EXHIBIT 22], requesting "Reports of

1   Investigation" which were completed by the Chicago ICE Office of Professional Responsibility

2   (OPR), in response to the frivolous complaint and Conduct Incident Report submitted by the

3   Director of the Federal Air Marshal Service on August 26, 2004, accusing the Plaintiff of

4   violating numerous FAMS policies and regulations in regards to the unauthorized release of

5   Sensitive Security Information to the media.  On September 17, 2007, a year and a half after the

6   Plaintiff filed his FOIA request, *the government Defendant released the requested documents*

7   *to the Plaintiff*.  The non-criminal administrative Report of Investigation [EXHIBIT 23],

8   detailed the investigation that was conducted, addressing each of the allegations against the

9   Plaintiff.  The final administrative Report of Investigation concluded the following:

10          "The investigation conducted by OPR/Chicago uncovered no evidence or

11          witnesses to support the allegation. The OPR/Chicago investigation determined

12          that the information provided OPR/Chicago by FAM management relevant to

13          this allegation, did not support the allegation that FAM Black released any

14          sensitive and or secure information. Additionally, FAM management neither

15          provided, nor produced any witnesses, or evidence to support the allegation that

16          FAM Black ever released, in any form, sensitive and or secure information

17          to any unauthorized groups or associations."

18   Apparently, the government Defendant doesn't have a problem releasing administrative

19   Reports of Investigation, when investigations are conducted against subordinate employees,

20   and the investigations are subsequently adjudicated *unfounded and without merit*.  Yet when a

21   subordinate employee requests the release of similar administrative Reports of Investigation,

22   when an investigation is conducted against supervisory managers caught blatantly violating

23   agency regulations and policies, the government Defendant suddenly screams there is an

24   unwarranted invasion of personal privacy, and administrative Reports of Investigation are

25   miraculously transformed into protected unreleasable law enforcement records.

26          The government Defendant therefore wants this court to enforce an unjust double

27   standard through a biased and morally unfair suspension of the principle that all are equal under

28   the law.  Such double standards are seen as unjustified because they violate a basic maxim of

34

1   modern legal jurisprudence — that all parties should stand equal before the law — without

2   infringing upon the impartiality principles of justice.

3

4   **V.    The Court Should Review the Documents in Camera**

5           The Plaintiff urges the Court to conduct an *in camera* review of the withheld documents.

6   See 5 U.S.C. § 552(a)(4)(B) (permitting *in camera* review); and in *Carter v. Department of*

7   *Commerce*, 830 F.2d 388, 392 (D.C. Cir. 1987) (criteria for *in camera* review is "Whether the

8   district court judge believes that an *in camera* inspection is needed in order to make a

9   responsible and well-founded de novo determination on the claims of exemption."). If the Court

10  subsequently concludes that Defendants have met their burden of demonstrating that the

11  withheld records contain at least some exempt material, the Plaintiff requests that the Court

12  then conducts an *in camera* review of the withheld records, to determine what segregable

13  material they contain. It is highly unlikely that **6,250 pages** of documents warrant a blanket

14  denial. See *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978) (a trial judge may order *in*

15  *camera* review "on the basis of an uneasiness or doubt he wants satisfied, before he takes

16  responsibility for a de novo determination.").

17          As the D.C. Circuit has recognized, in camera review is particularly necessary when the

18  records relate to unlawful government activity. See *Allen v. Central Intelligence Agency*, 636

19  F.2d 1287, 1299 (D.C. Cir. 1980) (ordering *in camera* review of withheld documents; "since it

20  is in these instances that the representations of the agency are most likely to be protective and

21  perhaps less than accurate, the need for *in camera* inspection is greater.") (overruled on other

22  grounds in *Founding Church of Scientology of Washington, D.C. v. Smith*, 721 F.2d 828 (D.C.

23  Cir. 1983)); *Id.* at 1300 ("Such a FOIA request, in an area of great public interest and that seeks

24  to demonstrate the impropriety of the Agency's actions, makes *in camera* inspection especially

25  appropriate."); See also *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978) ("A judge has

26  discretion to order *in camera* inspection on the basis of an uneasiness, or a doubt he wants

27  satisfied, before he takes responsibility for a de novo determination.").

28  : : :

## VI.   Redaction of Personal Identifiable Information from Requested Documents

The Plaintiff firmly believes that throughout this case: (1) the government Defendant has not met its legal burden of establishing a rational nexus between the agency's (ICE-OPR) law enforcement duties and the requested administrative Reports of Investigation (ROI's) that are being withheld by the government Defendant; (2) the government Defendant has not submitted to this Court any detailed affidavits, from any ICE-OPR law enforcement officer, or other federal employee that was personally involved in the underlying ICE-OPR investigations discussed in this case, and/or any employee that has personal experience with conducting criminal *and* administrative investigations of federal employees, showing that the requested administrative Reports of Investigations logically fall within any of the Defendant's claimed exceptions; (3) the government Defendant has not submitted to this Court any detailed affidavits, from any ICE-OPR law enforcement officer, or other federal employee that was personally involved in the underlying ICE-OPR investigations discussed in this case, and/or any employee that has personal experience with conducting criminal *and* administrative investigations of federal employees, showing that any of the underlying ICE-OPR investigations discussed in this case were in fact conducted pursuant to ICE-OPR's duty to investigate allegations of employee misconduct which would constitute illegal criminal violations of state or federal law; and (4) the government Defendant has not submitted to this Court any detailed affidavits, from any ICE-OPR law enforcement officer, or other federal employee that was personally involved in the underlying ICE-OPR investigations discussed in this case, and/or any employee that has personal experience with conducting criminal *and* administrative investigations of federal employees, showing how any of the ICE-OPR investigators that conducted the underlying investigations, determined that the underlying investigations discussed in this case were specifically for law enforcement purposes.

Nevertheless,  on June 19, 2013, the Plaintiff participated in a settlement conference in the judges chambers, with the government Defendant, in which he limited his request of the 6,250 pages of information being withheld by the Defendant, to approximately 22 withheld documents — the specific Reports of Investigations (ROI's) of the underlying investigations.

Additionally, the Plaintiff firmly believes that after balancing the Defendant's privacy interests in this case, with the strong public interest of releasing the requested documents, the release of requested documents would *not* constitute a clearly unwarranted invasion of personal privacy. Nevertheless, in an effort to allay the fears of the government Defendant regarding the release of personal identifiable information, in the aforementioned settlement conference, the Plaintiff magnanimously offered to the government Defendant, the option of redacting in those few remaining requested documents, all names, addresses, and phone numbers of any and all federal agents, employees, interviewees, witnesses, and other third parties that participated in the underlying ICE-OPR investigation (excluding the Plaintiff's name and information).

As of this date, the government Defendant has refused the Plaintiff's generous offer, and continues to withhold the reduced number of requested documents in violation of federal law.

## **CONCLUSION**

For the reasons set forth above, the Court should immediately grant Plaintiff's motion for Summary Judgment, and if the court deems it necessary, the Court should also review the requested documents *in camera*, in order to make a well-founded de novo determination.

Dated:  January 20, 2014

Respectfully Submitted,

P. Jeffrey Black

*Plaintiff Pro Se*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

P. JEFFREY BLACK
7582 Las Vegas Blvd S #450
Las Vegas, Nevada 89123

       Plaintiff,

    v.

UNITED STATES DEPARTMENT
OF HOMELAND SECURITY

       Defendant.

Case No.   2:10–CV–02040–JCM–VCF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service to the Defendant, of the preceding Plaintiff's *Motion For Summary Judgment And Memorandum of Points and Authorities In Support of Motion For Summary Judgment*, was made on January 21, 2014, by personally hand delivering copies thereof to the Office of the United States Attorney, Lloyd George Federal Building, 333 South Las Vegas Boulevard, Suite 8016, Las Vegas, NV 89101.

DATED this 21st day of January, 2014.

Respectfully Submitted,

_____

P. Jeffrey Black, *Plaintiff Pro Se*
7582 Las Vegas Blvd S #450
Las Vegas, NV 89123-1009
(800) 980-2185

1